IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

OCT 11 2019

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

UNITED STATES OF AMERICA,

Plaintiff,

v.

CRIM. ACTION NO.: 5:19CR20
(BAILEY)

KENNETH TRIBETT,

Defendant.

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT DEFENDANT'S MOTION [19] TO SUPPRESS EVIDENCE BE DENIED

Currently pending before the Court is Defendant's Motion [19] to Suppress Evidence, filed August 29, 2019. Plaintiff filed a Response in Opposition [27] on September 24, 2019. The Court held an evidentiary hearing on September 25, 2019. After considering the parties' briefs, the applicable law and the Court file, and after considering the evidence and argument presented during the aforementioned hearing, the undersigned would **RECOMMEND** that Defendant's Motion to Suppress [ECF No. 19] be **DENIED**.

## I.
## FACTUAL/PROCEDURAL HISTORY

Defendant was arrested on January 21, 2019 following the traffic stop at issue. During the traffic stop, a firearm was found in a backpack allegedly belonging to Defendant. On May 7, 2019, Defendant was indicted on two (2) counts of Unlawful Possession of a Firearm. On August 29, 2019, Defendant filed the instant Motion to Suppress. The undersigned held a

hearing on September 25, 2019, at which time evidence was taken. The evidence presented during the hearing of September 25, 2019 adduced the following facts.

### A. Testimony of Officer Robert Scott

In the early morning hours of January 21, 2019, Wheeling Police Officer Robert Scott conducted a traffic stop of a vehicle operated by Defendant, Kenneth Tribett. Defendant had two passengers that night: Daniel Ferry (front seat passenger) and Amanda Ferry (rear passenger). During his shift and prior to the traffic stop, Officer Scott had been patrolling his usual beat in South Wheeling, which included the area around the Luau Manor. He was familiar with the Luau Manor, specifically that it was a place about which police received complaints, where violent incidents took place, and at which drug activity occurred. During one of his passes by Luau Manor, Officer Scott observed a silver Chevy truck (later determined to be Defendant's truck) pulled up to the front of the Luau Manor. Someone exited the vehicle and went into Luau Manor. Officer Scott kept driving but made a mental note of that activity.

On another pass, Officer Scott observed the truck still parked in front of Luau Manor. Nevertheless, he continued driving. Approximately 5-10 minutes later, the truck pulled away. Officer Scott was on Chapline Street heading north when he saw the vehicle pull away from Luau Manor. Officer Scott pulled behind the truck. He could not read the truck's license plate. Officer Scott could not determine whether the tag lights were broken or whether the license plate was dirty. Regardless of which one it was, Officer Scott believed that his inability to read the license plate constituted a violation of West Virginia State law. He allowed several minutes to pass, thinking that the tag lights might come on. When they did not, Officer Scott initiated the traffic stop at issue.

The stop was initiated at approximately 2:30 a.m. around 16th Street near West Virginia Northern Community College in downtown Wheeling, WV. When Officer Scott activated his lights, Defendant's truck pulled over in the 7-11 parking lot. According to Officer Scott, it was bitterly cold out and there was hardly anyone on the road. When Officer Scott initiated his lights, the dash camera began recording. The cruiser camera was also recording outside and inside the cruiser. Additionally, Officer Scott was wearing a body camera that night.

According to Officer Scott, the body camera records everything. Officers can specifically request footage if they feel that they will need it later. He recalls requesting the footage from this particular traffic stop. He believes the camera worked accurately and recorded what was meant to be recorded.

When Officer Scott approached Defendant's vehicle, he noticed that the windows were foggy/icy. He made contact with Defendant, who was the driver, but the window was not rolled down because, according to Defendant, the door was frozen. It was difficult to see into Defendant's truck. Notwithstanding, Officer Scott was able to communicate with the passengers in the vehicle. There were three (3) occupants total, previously identified as Defendant (driver), Daniel Ferry (front seat passenger) and Amanda Ferry (rear seat passenger). Officer Scott did not see Amanda Ferry until he moved around the vehicle while using his flashlight.

Officer Scott advised Defendant of the equipment violations and asked to see Defendant's driver's license, registration and proof of insurance. Defendant provided his driver's license. He was unable to provide Officer Scott with a valid registration for the vehicle. Officer Scott returned to his cruiser to give Defendant a chance to look for the registration. While he was in his cruiser, he used Defendant's driver's license to search for outstanding

warrants. He called for a K-9, but a K-9 did not seem to be close to the traffic stop. No outstanding warrants were located.

Officer Scott returned to Defendant's vehicle to continue his investigation. Defendant still could not provide his registration. Officer Scott shined a light into the vehicle. He saw empty pill bottles in plain sight. He asked Defendant about the empty pill bottles, and specifically whether there were any other drugs in the vehicle. Officer Scott ran through different, individual drugs. Though he directed his questions to Defendant, he was trying to inquire of all passengers. They all answered "no." During the stop, Officer Scott also inquired as to whether there were weapons in the vehicle. He was told there were no weapons in the vehicle.

Officer Scott requested permission to search the vehicle multiple times. He was given permission. Defendant and Mr. Ferry exited the vehicle, but Ms. Ferry remained in the back seat for the search. According to Officer Scott, it was extremely cold outside, and he did not want her to have to get out of the vehicle. Defendant and Mr. Ferry mentioned waiting inside the 7-11 during the search, but Officer Scott cautioned them against that, as they would be unable to revoke their consent if they wished.

During his search, Officer Scott observed pill bottles and a backpack in the front seat. He asked who the backpack belonged to. Defendant claimed ownership of the backpack and he gave Officer Scott his permission to search the backpack. Officer Scott located a firearm in the backpack.

The firearm shocked him at first because he had asked previously whether there were any weapons in the vehicle and all passengers denied having any weapons. Officer Scott also realized that he had not fully patted down the Defendant. Officer Scott handcuffed Defendant

4

and patted him down. Defendant claimed ownership of the gun. He said a family member put the gun in his backpack. Defendant was arrested. Drug paraphernalia was found during the balance of the search.[1]

On cross examination, Officer Scott admitted that he did not see anyone come from the Luau Manor and get into the vehicle, nor did he see anything illegal out in the open. Notwithstanding this, he believed there was suspicious activity. His suspicions were based upon the time of night, the weather, and the location. Officer Scott also admitted that he did not see a moving violation; only an equipment violation was observed. There was no call to be on the lookout for Defendant's vehicle on the night of the traffic stop. The pills in the pill bottle were all the same size and shape, so Officer Scott was not concerned about the pills. There was nothing else in plain view in the cabin that indicated he would find drug paraphernalia upon a search. All passengers were completely calm and there were no physical indications that they were hiding something. Officer Scott did note, however, that the amount of clothing worn by the passengers and Defendant made it difficult to discern their movements. Notwithstanding this, Officer Scott acknowledged that it was not uncommon for the passengers and Defendant to have that amount of clothing on their bodies given the temperatures. Officer Scott did not issue an equipment violation as a result of the stop.

Officer Scott denied threatening to use a drug dog if no consent to search was given.

**B. Review of Body Camera Video (Government's Exhibit No. 1)**

The body camera video begins at approximately 2:27 a.m. as Officer Scott approaches Defendant's truck. Defendant advises through the closed door that he cannot roll the window down and cannot open the door. During the first minute of the traffic stop, Officer Scott

---

[1] Officer Hales arrived on scene during the course of the search. Officer Hales was not called to give testimony.

identifies himself through the closed door and advises Defendant that he cannot see Defendant's license plate. Officer Scott says that either the plate is dirty, or the tag lights are out. If the plate is dirty, this is "Improper Display of Registration." If the tag lights are out, this is "Defective Equipment." Officer Scott then asks for Defendant's driver's license, registration and proof of insurance. Defendant identifies the passengers at Officer Scott's request. Defendant cannot locate his proof of registration. Officer Scott asks whether there are weapons in the vehicle. All passengers deny having weapons in the truck.

Officer Scott continues to wait outside of the truck for Defendant to locate the registration. At approximately two minutes into the traffic stop, Officer Scott asks Defendant about his intended destination. Defendant indicates that they were on their way to the Knight's Inn. Officer Scott reaffirms that the driver's side door is frozen shut.

At approximately three minutes into the traffic stop, and while Defendant continues to look for his registration, Officer Scott walks to the back of the truck, contacts dispatch and provides the license plate number. (During his testimony, Officer Scott advised he gave the license plate information to dispatch because if 'something happened,' they would know what vehicle was involved.) At approximately 2:31 a.m., or about four minutes into the stop, Officer Scott returns to the driver's side of the truck to see whether Defendant has located the registration. Defendant advises that he cannot locate the registration. At approximately 2:31:53 a.m., Officer Scott returns to his cruiser while Defendant continues to try and find his proof of registration.

At approximately 2:35:38 a.m., Officer Scott again returns to Defendant's truck and Defendant again advises that he cannot find the registration. Front seat passenger Daniel Ferry is holding a flashlight, which illuminates the interior of the truck. At approximately 2:36:29 a.m.,

6

Officer Scott questions the occupants of the vehicle about the prescription pill bottles that Officer Scott can see in plain view, and which are located in the front console of the truck. Defendant claims ownership of the pill bottles. Officer Scott then asks where Defendant and his passengers were coming from. They advise they came from Luau Manor. Officer Scott asks if they know that the Luau is "horrible." Daniel Ferry denies living at Luau Manor. Officer Scott asks if anyone has anything on them. All passengers deny having marijuana, cocaine, methamphetamine, or heroin in the vehicle. At approximately 2:37:36, Officer Scott asks for permission to search the vehicle. All passengers give consent at approximately 2:37:40 a.m., or approximately ten minutes into the traffic stop. At approximately 2:38:23 a.m., Officer Scott confirms consent to search the vehicle.

Defendant and his front seat passenger exit the vehicle from the front passenger side (the driver's door is still frozen shut). Officer Hales has arrived on scene by this time. At approximately 2:40 a.m., Officer Scott confirms Defendant's consent to search the vehicle. Officer Scott asks Defendant to "hang tight" while he searches the vehicle so that Defendant can withdraw his consent to search if he so decides. At approximately 2:41 a.m. Officer Scott begins his search of the vehicle. Officer Scott does not require Amanda Ferry to exit the vehicle before the search starts.

Officer Scott locates a bag/backpack in the vehicle at approximately 2:41:49 a.m. He asks who owns the bag. Defendant claims ownership. Officer Scott requests permission to search the bag. Defendant gives his consent. At approximately 2:42:26, about fifteen minutes into the stop and while searching the bag/backpack, Officer Scott locates a pistol in the bag. Immediately after locating the pistol, Officer Scott warns Officer Hales that Officer Scott did not

pat down the Defendant. He instructs everyone present to put their hands in the air. Officer Scott requests another car at approximately 2:42:53 a.m.

Officer Scott and Officer Hales instruct the female rear-seat passenger to exit the vehicle. Defendant is placed in handcuffs. Daniel Ferry is instructed to put his hands on his head. All three occupants are instructed to stand against the wall of an adjacent building. At approximately 2:44:35 a.m., and after being asked by Officer Scott, Defendant states that he owns the gun. Officer Scott contacts dispatch to obtain information concerning the firearm found. Nothing is found by dispatch. Officer Scott continues searching the vehicle.

While continuing his search, Officer Scott again asks whether there is 'anything' in the vehicle. The other two passengers are not placed in handcuffs. At approximately 2:49:02 a.m., needle caps are located in the pickup truck. Officer Scott returns to the occupants and asks them about the needle caps. The occupants disclaim knowledge about the needle caps and deny shooting drugs. Officer Scott asks again if there is 'anything' in the truck. All occupants deny having anything illegal in the truck. Officer Scott returns to the truck at approximately 2:50:52 a.m. to resume his search.

At approximately 2:52:06 a.m., Officer Scott voices the possibility that they're "good," apparently meaning that he does not believe anything else will be found. He returns to the Defendant and moves Defendant to the front of his patrol car where he allows Defendant to put his hands on the front of the vehicle to get warm. Officer Scott commences a pat down of Defendant's person. At approximately 2:53:56 a.m., Officer Scott finds a scale with white powder residue still visible on it, on Defendant's person.[2] Defendant is then taken into the 7-11

---

[2] It sounds as though Defendant says "shit" just before Officer Scott locates the scale on Defendant's person.

as are the other two passengers. Officer Scott continues searching the vehicle and advises dispatch that there is one (1) person detained (Defendant).

At approximately 3:01:50 a.m., and while searching the vehicle further, Officer Hales advises Officer Scott that that crystal methamphetamine has been found. It is unclear from the audio on whom the crystal methamphetamine was located, but all indications appear to be that it was found on Defendant. Defendant is placed under arrest at approximately 3:02:02 a.m, approximately thirty-five (35) minutes after the traffic stop commenced.

## II.
## ARGUMENTS OF THE PARTIES

### A. Defendant's Arguments

Defendant claims that, rather than investigate the alleged equipment violation, Officer Scott immediately began questioning Defendant regarding suspected drug activity. According to Defendant, the Officer Scott immediately deviated from the purpose of the traffic stop and extended the stop well beyond the time reasonably necessary for a stop to investigate an alleged equipment violation. Defendant maintains that this traffic stop and the investigative methods utilized were beyond the scope authorized in *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011).

Additionally, Defendant argues that there was no consent to search the backpack. Rather, Defendant contends that Officer Scott's search of the backpack is the result of Officer Scott offering to make a "deal" with Defendant: that in exchange for consent to search the vehicle, Officer Scott would not call the drug dog.

Finally, Defendant argues that any statements obtained were custodial statements obtained coercively and in derogation of his Fifth Amendment Right against compelled self-incrimination and therefore should be suppressed.

**B. Government's Arguments**

The Government contends that the traffic stop was reasonable, and that it was extended by Defendant's inability to produce registration for the vehicle that he was operating at the time of the stop, and that Officer Scott had consent to search the vehicle.

With respect to Defendant's argument that all statements made by Mr. Tribett should be suppressed, the Government contends this is without merit. The Government argues that *Miranda* warnings are not required when a person is questioned during a routine traffic stop. The Government relies upon *United States v. Sullivan*, 138 F.3d 126 (4th Cir. 1998) for this proposition.

### III.
### STANDARDS

The burden of proof for a Motion to Suppress is on the party seeking to suppress the evidence. *United States v. Gualtero*, 62 F.supp.3d 479, 482 (2014) ("[t]he legal standards governing a motion to suppress are clear....[t]he burden of proof is on the party to seeks to suppress the evidence") (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)). Once the defendant establishes a basis for his Motion, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence. *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974)). With these standards in mind, the undersigned will turn to the substance of the arguments raised vis-à-vis Defendant's Motion to Suppress.

# IV.
# DISCUSSION

The Fourth Amendment guarantees the "right of people to be secure...against unreasonable searches and seizures." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) (citing *Wilson v. Arkansas*, 514 U.S. 927, 931 (1914) "[t]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable"). When a police officer stops a vehicle and detains the occupants briefly, this constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Id.* at 810. Any ulterior motive to the stop is irrelevant. *Id.* at 813.

"A traffic stop typically begins when a car is pulled over for investigation of a traffic violation." *United States v. Digiovanni*, 650 F.3d at 506 (internal citations and quotations omitted). A traffic stop is treated under the standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968) because a traffic stop is more akin to an investigative detention rather than a custodial arrest. *Id.*

*Terry* sets forth two prongs on which to analyze the propriety of a traffic stop: (1) whether the police officer's action was justified at the inception of the stop; and (2) whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Id.* "If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate the vehicle." *United States v. Branch*, 369 F.3d 328, 337 (4th Cir. 2008). If a police officer wishes to extend the traffic stop to investigate matters which fall outside the reason for the initial stop, the officer must either have reasonable suspicion or the driver's consent. *Digiovanni*, 650 F.3d at 507; *see also Branch*, 369 F.3d at 336 ("[t]he driver's consent or reasonable suspicion of a crime is necessary to extend a traffic stop for investigatory purposes").

"[T]o demonstrate reasonable suspicion, a police officer must offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot." *Branch*, 369 F.3d at 336 (internal citations and quotations omitted).

### A. The Stop

In the instant matter, it appears undisputed that Officer Scott had probable cause to believe that a traffic violation had occurred, i.e. the faulty equipment (broken tag lights) or the improper display of the license plate (the fact that the plate was dirty).[3] Therefore, Officer Scott's initiation of the traffic stop was reasonable. *See Whren*, 517 U.S. at 810. Notwithstanding, Defendant argues that the stop at issue was not reasonable because Officer Scott "did not bother with the 'routine' aspects of a traffic stop whatsoever." ECF No. 19 at p. 4. Rather, Defendant contends that Officer Scott "chose to immediately investigate suspected drug activity based *solely* on his understanding that Mr. Tribett had been in an area known for drug activity shortly before the stop." (Emphasis in original.) ECF No. 19 at p. 4. Defendant further argues that the "encounter, therefore, immediately deviated from the purpose of the traffic stop and extended well beyond the time reasonably necessary for one premised on the failure to properly display a license plate." ECF No. 19 at p. 4. A review of the video from Officer Scott's body camera, however, reveals that this argument is without merit.

Immediately upon engaging Defendant, Officer Scott advised Defendant of why he pulled Defendant over (Officer Scott could not see the license plate).[4] Officer Scott asked to see Defendant's license, registration and proof of insurance. Though Defendant provided Officer Scott with his driver's license and proof of insurance, Defendant could not locate his registration, so Officer Scott waited. As he waited, Officer Scott walked to the rear of Defendant's truck,

---

[3] No evidence or argument has been raised to the contrary.
[4] Notwithstanding the fact that Defendant was not issued a citation for improper display or faulty equipment, the fact that his plate could not be seen has not been factually disputed.

contacted dispatch and provided the license plate information. He then returned to the driver's side of the truck to inquire as to whether Defendant had been able to locate his registration. Defendant had not. Officer Scott gave Defendant still more time and went to his cruiser to begin the process of checking Defendant's driving information. When Officer Scott returned to Defendant's truck, Defendant again advised that he could not find the registration for the vehicle. Thus, the first approximately eight (8) minutes of the traffic stop consisted of matters almost solely related to the reason for pulling Defendant over.[5] Moreover, and despite Officer Scott diligently pursuing the purpose of the traffic stop, Officer Scott could not bring the traffic stop to a quick and seamless resolution because Defendant could not locate his registration.

Defendant also claims that Officer Scott unreasonably extended the traffic stop well beyond the time reasonably necessary for a stop premised upon improper display or faulty equipment. This argument is likewise without merit. As was stated above, Officer Scott is not the person responsible for extending the traffic stop at issue. Rather, the traffic stop was extended because Defendant was unable to locate the registration for his truck. While Defendant was attempting to locate the registration, Officer Scott used the time to ask investigative questions, i.e. where they had been and where they were going, and whether there was anything in the truck that Officer Scott needed to be concerned about. Such questioning was clearly permitted because it did not extend the traffic stop but was conducted in conjunction with Officer Scott's attempts to pursue the information typically associated with a traffic stop for faulty equipment or improper license display. *See Digiovanni*, 650 F.3d at 507 ("a police officer may ask questions unrelated to the purpose of the stop, provided that the unrelated questioning does

---

[5] As will be discussed *infra*, while waiting for Defendant to locate his registration, Officer Scott asked the occupants of the truck where they had been and where they were going.

not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention").

Additionally, though the undersigned believes that the totality of the circumstances here (Defendant stopping at a known drug location, the time of night, the freezing temperatures, the inability to find vehicle registration, and prescription pill bottles in plain view) constituted reasonable suspicion of drug activity so as to extend the traffic stop to conduct further investigation regarding the same, such a finding is not necessary here because, as is explained, *infra*, Officer Scott had Defendant's consent to continue his investigation. *Id.*

**B.      Consent**

Defendant next argues that Officer Scott did not have consent to search the truck or the bag wherein the gun was located. This argument is similarly without merit. At approximately nine (9) to ten (10) minutes into the stop, and while waiting for Defendant to locate his registration (which is a routine aspect of a traffic stop), Officer Scott inquired as to who owned the prescription pill bottles which were in plain view in the center console of the truck. When he so inquired, the interior of the truck was illuminated by a flashlight which Daniel Ferry held (presumably to assist Defendant in searching for his registration). Officer Scott then asked whether he could search the truck. All passengers clearly consented to the search.

While searching the truck, Officer Scott located a bag/backpack. He inquired as to who owned the backpack. As is clear from the body camera video, Defendant claimed ownership. Officer Scott then asked whether he could search the bag/backpack. Defendant clearly gave his consent for Officer Scott to do so.

It should be noted that, throughout this encounter, Officer Scott repeatedly and clearly reconfirmed that he had Defendant's consent to conduct the searches of the truck and the

bag/backpack. Officer Scott also advised Defendant to stay near the truck outside (rather than going into the 7-11 to get warm) so that Defendant could revoke his consent if he chose. There is no evidence or indication that Defendant ever revoked his consent to search during this encounter.

Defendant claims that his consent was not voluntarily given but was given only because Officer Scott offered to make a "deal" with Defendant, i.e. if Defendant consented to the search, Officer Scott would not call in the K-9 unit. This contention is without merit. Indeed, there is no evidence, either by way of Officer Scott's testimony or anything on the body camera video, which supports the factual assertion that Officer Scott offered to make the aforementioned deal with Defendant. Similarly, there is no other evidence that Defendant's consent was coerced. To the contrary, the evidence demonstrates that Officer Scott very clearly and repeatedly obtained Defendant's consent to search the vehicle and the contents thereof. Officer Scott also took the added precaution of asking Defendant to remain close to the truck despite the freezing temperatures so that Defendant would be able to revoke consent if he chose to do so.

### C.      Statements/*Miranda*

Finally, Defendant argues that any statements obtained from Defendant "following execution of the search" were custodial statements obtained coercively and in derogation of Defendant's Fifth Amendment Rights. Defendant further argues that any statements obtained from Defendant "on a post-search basis are presumptively inadmissible" even if Defendant had been *Mirandized* because of the deficiencies in the subject search and the illegality of his arrest. ECF No. 19, at p. 4. Defendant has not specifically identified the statements which he claims should be suppressed, however. Without identification of those statements which Defendant

contends should be suppressed, the undersigned cannot meaningfully consider Defendant's arguments.

Moreover, and to the extent it could be argued that a general identification would enable a meaningful review of this issue, the undersigned would nevertheless conclude as above because the statements at issue cannot be identified generally either. Defendant uses the following phrases to describe the statements he seeks to suppress: (1) those made "following execution of the search" and (2) those made "on a post-search basis." However, each phrase is ambiguous in that each could be reasonably read to mean either one of the following: (1) statements made after the search has been commenced but before completion, or (2) statements made after completion of the search. Though this issue was mentioned briefly at the end of Defendant's Motion and again towards the end of the hearing held in this matter, nothing from those arguments clarifies the time period to which Defendant refers. There were many exchanges between Defendant and Officer Scott during the traffic stop, and because of the way in which the events of the traffic stop unfolded, each exchange between Officer Scott and Defendant involved a slightly different set of circumstances. As a result, each exchange carries with it, its own, separate set of possible objections. Defendant also appears to have interacted with Officer Hales during these events. It is therefore impractical, and it is also improper for the undersigned to speculate at the objections Defendant might raise to any given interaction. For these reasons, the undersigned cannot meaningfully consider this issue vis-à-vis the instant case.

## V.
## CONCLUSION

Defendant has failed to establish a basis upon which to suppress the evidence that is the subject of his Motion. Accordingly, and for all of the foregoing reasons, the undersigned **RECOMMENDS** that the Defendant's Motion to Suppress Evidence [ECF No. 19] be **DENIED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within **fourteen (14) days** after being served with a copy of this Report and Recommendation file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to parties who appear pro se and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia, to the United States Marshals Service and to the United States Probation Office.

Dated: 10/11/2019

JAMES P. MAZZONE
UNITED STATES MAGISTRATE JUDGE

17